UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SHARON QUIGLEY,                          :
                                         :
        Plaintiff,                       :
                                         :
v.                                       :    No. 3:02CV1083 (DJS)
                                         :
THE UNUM LIFE INSURANCE                  :
COMPANY OF AMERICA,                      :
                                         :
        Defendant.                       :
                                         :

## MEMORANDUM OF DECISION

Plaintiff Sharon Quigley brings this action pursuant to
Section 502 of the Employee Retirement Income Security Act
("ERISA"), 29 U.S.C. § 1132, to recover disability benefits
allegedly payable to her as a beneficiary of a group long-term
disability policy ("the plan") administered by defendant UNUM
Life Insurance Company of America ("UNUM"). The parties have
filed cross-motions for summary judgment. For the reasons set
forth herein, plaintiff's motion for summary judgment (dkt. # 31)
is **GRANTED,** and defendant's motion for summary judgment (dkt. #
27) is **DENIED.**

### I. FACTS

Quigley claims to suffer from fibromyalgia. The Mayo Clinic
offers the following description of this condition:

> You hurt all over and you frequently feel exhausted.
> Even after numerous tests, your doctor can't seem to
> find anything specifically wrong with you. If this
> sounds familiar, you may have fibromyalgia, a condition
> that affects an estimated 3 million to 8 million people

in the United States. Approximately 80 percent to 90
percent of affected people are women.

Fibromyalgia is a chronic condition characterized by
fatigue and widespread pain in your muscles, ligaments
and tendons. Previously, the condition was known by
other names such as fibrositis, chronic muscle pain
syndrome, psychogenic rheumatism and tension myalgias.

In 1990, the American College of Rheumatology (ACR)
identified specific criteria for fibromyalgia.[1] The
ACR classifies a patient with fibromyalgia if at least
11 of 18 specific areas of your body are painful under
pressure.  Also, you must have had widespread pain
lasting at least 3 months.

Although the intensity of your symptoms may vary,
they'll probably never disappear completely. It may be
reassuring to know, however, that fibromyalgia isn't
progressive, crippling or life-threatening.

Mayo Clinic Staff, Fibromyalgia, at http://www.mayoclinic.com/

(dated Apr. 24, 2003) (visited Sept. 23, 2004).  With respect to

diagnosis, the Mayo Clinic offers the following observations:

Diagnosing fibromyalgia is difficult because there
isn't a single, specific diagnostic laboratory test. In
fact, before receiving a diagnosis of fibromyalgia, you
may go through several medical tests, such as blood
tests and X-rays, only to have the results come back
normal. Although these tests may rule out other
conditions, such as rheumatoid arthritis, lupus and
multiple sclerosis, they can't confirm fibromyalgia.

The American College of Rheumatology has established
some general classification guidelines for
fibromyalgia, to help in the assessment and study of
the condition. These guidelines require that you have
widespread aching for at least 3 months and have a
minimum of 11 locations on your body that are
abnormally tender under relatively mild pressure. In
addition to taking your medical history, a doctor

---

[1] UNUM relied upon this standard when evaluating plaintiff's
claim.  (See Dkt. # 35, ¶ 1 at 1).

checking for fibromyalgia will press firmly on specific
points on your head, upper body and certain joints so
that you can confirm which cause pain.

However, not all doctors agree with the guidelines.
Some believe that the criteria are too rigid and that
you can have fibromyalgia even if you don't meet the
required number of tender points. Others question how
reliable and valid tender points are as a diagnostic
tool.

Id. Symptoms include widespread pain, which "generally persists

for months at a time and is often accompanied by stiffness;"

fatigue and sleep disturbances; irritable bowel syndrome; chronic

headaches and facial pain; heightened sensitivity; depression;

numbness or tingling sensations in the hands and feet

(paresthesia); difficulty concentrating and mood changes; chest

pain or pelvic pain; irritable bladder; dry eyes, skin and mouth;

painful menstrual periods; dizziness; and sensation of swollen

hands and feet.  See id.

The medical records submitted to UNUM and incorporated into

its claims file[2] indicate that the process of diagnosing and

treating Quigley's condition began in late 1999.  During a visit

to her primary care physician, Satesh Singh, M.D., Dr. Singh

noted that Quigley complained of "aches and pains in all joints,"

and that it was possible that she suffered from arthritis.  (Dkt.

# 30, at UACL 289).  Dr. Singh apparently ordered and reviewed

the results of subsequent laboratory tests designed to diagnose

---

[2] Citations to the medical records will be in the following
format: (Dkt. # 30, at UACL _____).

arthritis, which he concluded were "not consistent with a generalized arthritis. . . ." (Dkt. # 30, at UACL 294). Dr. Singh stated that, "if the aches and pains continue[,] we will arrange a rheumatology[3] opinion." (Id.).

Quigley's first rheumatology consultation was with Lewis Parker, M.D., on December 16, 1999. Dr. Parker writes that Quigley

> describes the pain as being all over and starting in either the arms or the legs and spreading or becoming more diffuse; the problem is aggravated by standing or walking, typing or repetitive hand use. The pain is most prominent in the morning in association with significant stiffness that may persist until mid-day without any distinct gelling with mobility.

(Id., at UACL 206). Dr. Parker also noted that Quigley experienced dry eyes, mouth, and skin, and that she had suffered occasional paresthesias in her hands and feet. (Id., at UACL 207). Dr. Parker treated Quigley with Naprosyn, Prednisone, Darvocet, Sinequan, Ultram, and an injection of Depo-Medrol with

---

[3] "Rheumatology" is "the branch of medicine dealing with rheumatic disorders, their causes, pathology, diagnosis, treatment, etc." Dorland's Illustrated Medical Dictionary 1459 (28th ed. 1994). "Rheumatism" is

> any of a variety of disorders marked by inflammation, degeneration, or metabolic derangement of the connective tissue structures of the body, especially joints and related structures, including muscles, bursae, tendons, and fibrous tissue. It is attended by pain, stiffness, or limitation of motion of these parts. Rheumatism confined to the joints is classified as arthritis.

Id.

mixed results through late 1999 and early 2000.  Despite these

treatments, Quigley still complained of pain and Dr. Parker noted

tenderness in her limbs and back.  Dr. Parker listed Quigley's

"problem[s]" as "Syorgen's syndrome[4], probable," "Soft tissue

syndrome with bursitis, tendinitis and trigger points," and

"Carpal tunnel syndrome."  (Id., at UACL 200).

On March 13, 2000, Quigley consulted with a second

rheumatologist named Ann Parke, M.D. for the first time.  Both

Dr. Parke and Miriam Borden, M.D., a fellow who examined Quigley

with Dr. Parke, noted that Dr. Parker had referred Quigley to Dr.

Parke because he suspected that Quigley may have Sjorgen's

syndrome.  In March of 2000, Dr. Parke noted Quigley's

"complaints consisting of joint aches and pains, fatigue, one to

two hours or early morning stiffness, and recently dry eyes and

dry mouth."  (Id., at UACL 338).  Dr. Parke also noted Quigley's

"characteristic cushingoid features,"[5] and ordered an

---

[4] Sjorgen's syndrome is "a symptom complex of unknown
etiology" marked by some combination of keratoconjunctivitis,
gland enlargement, and a connective tissue disease such as
rheumatoid arthritis.  Dorland's Illustrated Medical Dictionary
1640 (28th ed. 1994).

[5] The term "cushingoid" is a reference to Cushing's syndrome,
which is a condition caused by excess intake of the hormone
cortisol, usually through steroids taken for therapeutic
purposes.  See Dorland's Illustrated Medical Dictionary 1628
(28th ed. 1994); Mayo Clinic Staff, Cushing's syndrome, at
http://www.mayoclinic.com/ (dated Feb. 4, 2003) (visited Sept.
29, 2004).  This condition causes the face and shoulders to
appear fatty or obese, as well as striations to appear.  See id.

endocrinology consultation.  (Id.).  Following Quigley's initial

consultation, Dr. Borden noted that Quigley "most likely" did not

have Sjorgen's syndrome, but, "[a]s to her multiple tender

points, and the pain, [Quigley] may have fibromyalgia."  (Id., at

UACL 332).

Quigley had subsequent consultations with Dr. Parke and Dr.

Borden from March of 2000 through August of 2000.  In April of

2000, Dr. Parke noted that Quigley had a positive reaction to

fourteen of the eighteen tender fibromyalgia tender points, and

that Quigley had ceased taking steroids.  Dr. Parke prescribed

Plaquenil to "help with the joint pains and fatigue."  (Id., at

UACL 329).  In June of 2000, Dr. Parke noted that the

endocrinology consultation indicated that Quigley "almost

certainly does not have Cushing's disease," but that Quigley had

"developed some adrenal crisis" necessitating the resumption of

steroid treatment.  (Id., at UACL 320).  Dr. Parke also noted

that Quigley "continues to complain of discomfort all over and

states that this is probably not just in the joints, but in all

other tissues as well.  She is achy and chronically tired."

(Id.).  A physical examination revealed "multiple trigger

points."  (Id.).  In August of 2000, Quigley complained that, due

to stiffness, she wakes up after four or five hours of sleep,

which causes her fatigue the next afternoon.  Dr. Borden also

noted "some tender points."  Dr. Parke and Dr. Borden planned to

give Quigley a steroid injection during her next visit in order
to determine if Quigley's reaction indicated inflammation.  Dr.
Parke also referred Quigley to a rehabilitation facility for
aquatic therapy.

In late 2000, Dr. Singh first suggested work restrictions
due to Quigley's chronic condition.  On September 19, 2000, Dr.
Singh wrote the following:

> Ms. Sharon Quigley has a number of medical problems
> including chronic fatigue syndrome and fibromyalgia
> with some underlying [illegible] vascular disease that
> is being investigated.  At this point she is partially
> disabled and can only work a maximum of 20 hours
> (twenty) per week.  Her condition can improve or worsen
> hence we will observe and keep her disability status
> adjustable based on her clinical condition.

(Id., at UACL 299).  On October 12, 2000, Dr. Singh noted that
Quigley was "not getting better" and still in "daily pain."
(Id., at UACL 80).  On December 4, 2000, Dr. Singh noted that
Quigley had fibromyalgia causing aches and pains.  He completed a
Physician's Statement form, created by UNUM, on which he
diagnosed Quigley with fibromyalgia, placed her on "full
limitation from work," and stated that his prognosis for recovery
was "chronic disability."  (Id., at UACL 344).  Dr. Singh
recommended that Quigley consult with the rheumatologists at the
Lahey Clinic.

Quigley did not return to Dr. Parke and Dr. Borden and
instead consulted with Paul Romain, M.D., of the Lahey Clinic.
Dr. Romain examined Quigley on December 6, 2000.  He noted that

-7-

Quigley had "experienced substantial fatigue," "some problems with memory loss," and "pain that is constant and widespread with multiple areas of tenderness notable. . . ." (Id., at UACL 266). In his examination, Dr. Romain found that Quigley had "2 to 3+ tenderness at 16 of 18 tender points characteristic of fibromyalgia in the upper and lower extremities, neck, chest, back, and hips." (Id., at UACL 264). Dr. Romain found "clinical fibromyalgia syndrome" and a "[h]istory of elevated sedimentation rate of unclear etiology or association," which was based upon a past laboratory test result. (Id., at UACL 264). Dr. Romain stated that Quigley "may well have started out with an inflammatory process and carpal tunnel symptoms and this may now be quiescent and it appears she developed an exacerbation of pain amplification disorder subsequent to that." (Id.). Dr. Romain also directed Quigley to increase her aquatic therapy. Dr. Romain also examined Quigley on January 25, 2001, and noted that she began to experience more persistent paresthesias, especially in the morning.

Following Quigley's evaluation from Dr. Romain, Dr. Singh went forward with his treatment plan for fibromyalgia. On January 15, 2001, Dr. Singh examined Quigley and noted that she continued to suffer from "generalized aches [and] pains" and that she had "multiple trigger points." (Id., at UACL 80). On January 31, 2001, Dr. Singh stated that, because of the failure to

-8-

discover any other underlying rheumatic condition, he was "[l]eft [with] [f]ibromyalgia as the diagnosis."  (Id., at UACL 82).  Dr. Singh continued to treat Quigley's pain, which the record reveals persisted into August of 2001, with Ultram.

Based upon the foregoing medical history, Quigley submitted a claim to UNUM for disability benefits under a policy procured by her employer, Reid & Reige, P.C. Quigley submitted her claim on January 5, 2001 and stated that the date she reached total disability was September 20, 2000, which, by operation of the ninety-day elimination period, rendered her eligible to receive benefits as of December 18, 2000.[6]  UNUM denied her claim on April 27, 2001.  On July 24, 2001, Quigley appealed UNUM's denial of benefits, and submitted additional materials for review.  On August 24, 2001, and October 5, 2001, UNUM declined to reverse its prior denial of benefits.  On November 27, 2001, Quigley appealed for a second time and submitted further additional materials.

Prior to denying Quigley's claims for benefits, UNUM's claims adjusters took the following measures to develop the record.  First, UNUM's representatives collected Quigley's medical records.  Second, at six times throughout the adjustment and appeal process, UNUM submitted Quigley's claims file to a

---

[6] Quigley left work on September 22, 2000, apparently on short-term disability leave.

registered nurse or a physician in order to obtain an answer to a question or group of questions posed by the claims adjuster. Third, UNUM sent a questionnaire to Dr. Singh, which included a functional capacity form. In response to this questionnaire, Dr. Singh indicated that Quigley could not "focus on any job for more than 3 hours per day" and that she was unlikely to return to employment "in the near future i.e. at least six months." Dr. Singh also stated that, based upon Quigley's statements and his own clinical experience, Quigley should be restricted to lifting not more than one to ten pounds only "occasionally," which is defined as not more than 33% of the time; that Quigley should bend, kneel, crawl, climb stairs, reach above her shoulder, and push or pull not more than five pounds only occasionally; and that she should do no more than a simple grasp with either hand. (Id., at UACL 212-15).

In addition to the medical records discussed herein, Quigley submitted the following materials in support of claim for benefits. On July 24, 2001, Quigley submitted a job description, a statement, and a statement dated July 5, 2001 from Dr. Singh. In her statement, Quigley reviewed the components of her job description and provided information regarding the difficulties she has with her appointed tasks. Dr. Singh's statement consisted of the following:

> 1. Due to chronic pain resulting from fibromyalgia, Ms. Quigley can work at a computer for no longer than 20

minutes at a time, and 3 hours in a day.

2. Frequently, due to pain resulting from fibromyalgia, she is unable to lift and carry any weight in excess of 1 lb.

3. Frequently, due to pain resulting from fibromyalgia, she is only able to walk slowly, and is unable to bend, kneel, crawl or climb stairs.

4. Due to cognitive deficits resulting from chronic pain, Ms. Quigley frequently is unable to perform a position that ever requires [her to] provide a high level of mental effort and strain, and [she is] unable to produce a high volume of information.

5. Due to cognitive defects resulting from chronic pain, Ms. Quigley cannot reliably proofread typed material for grammatical, typographical or spelling errors. The accuracy and speed of any computer work she does do will suffer due to such cognitive defects.

(Id., at UACL 137). On November 27, 2001, Quigley submitted Dr.

Singh's office notes from October of 2000 through November 27,

2001, a statement from Dr. Singh dated October 30, 2001, and a

statements from Edward Feinglass, M.D., dated October 26, 2001.

Dr. Singh stated that "the attached laboratory results of Sharon

Quigley, confirm an inflammatory process in this patient. This

is an objective test and cannot be varied by subjective

complaints." (Id., at UACL 75). Dr. Feinglass stated the

following:

> [Quigley] has a clinical history consistent with fibromyalgia, with generalized pain throughout the morning especially, despite chronic analgesic use. She also has associated with this chronic fatigue and requires napping at least two to three days out of the week. She has seen multiple specialists prior to seeing me and has had clinical trials of multiple classes of medication with no real benefit except for

-11-

> Ultram, which she takes chronically at 100 mg four
> times a day (the maximum dose).  She cannot function
> without it but is still substantially disabled with
> respect to persistent pain and fatigue. . . .  Some
> changes were made in her regimen, but I feel that her
> current pain and fatigue status constitute disabling
> problems with respect to any full-time or part-time
> employment.

(Id., at UACL 78).

UNUM referred Quigley's medical records, together with her

most recent submissions, to Lani Graham, M.D., M.P.H. for a

seventh, and ultimately final, review.  UNUM requested that Dr.

Graham answer the following questions:

- Do the records on file support a condition that
  would preclude sedentary work capacity as of
  9/22/00?  If not, please give specific reasons.

- Claimant's attorney indicates that the claimant
  has a new diagnosis.  Please indicate if the
  diagnosis was likely present as of 9/22/00 and if
  it would produce restrictions and limitations that
  would preclude sedentary work capacity.

- Do the records on file support the diagnoses of
  fibromyalgia, or chronic fatigue syndrome?

- Do the records on file support the restrictions
  and limitations outlined by the claimant's
  attending physician?

(Id., at UACL 66).  Upon reviewing all the medical records, Dr.

Graham reached the following conclusions: (1) that "the records

do not support loss of functional capacity for her usual work as

of 9/22/00," (2) that "it is not clear if [a fibromyalgia]

diagnosis was appropriate as of 9/22/00," (3) that "there is no

support in the record for chronic fatigue syndrome; and (4) that

-12-

"the restrictions and limitations provided on 7/5/01 by Dr. Singh are not reasonable."  (Id., at UACL 69).  Based primarily upon Dr. Graham's conclusions, UNUM denied Quigley's claim by letter dated January 3, 2002.

## II. DISCUSSION

Quigley seeks an order compelling UNUM to pay benefits due under the plan, attorneys' fees, and costs pursuant to Section 502 of ERISA.  Section 502 of ERISA provides, in pertinent part, that "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan. . . ."  29 U.S.C. § 1132(a)(1)(B).  UNUM denies Quigley's claim that she is owed benefits under the plan.  Each party seeks summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

### A.   STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient

showing on an essential element of [its] case with respect to
which [it] has the burden of proof." Celotex Corp. v. Catrett,
477 U.S. 317, 323 (1986). "The burden is on the moving party 'to
demonstrate the absence of any material factual issue genuinely
in dispute.'" American Int'l Group, Inc. v. London Am. Int'l
Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v.
Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir.
1975)). A dispute concerning a material fact is genuine "'if
evidence is such that a reasonable jury could return a verdict
for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist.,
963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view all
inferences and ambiguities in a light most favorable to the
nonmoving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d
Cir. 1991). "Only when reasonable minds could not differ as to
the import of the evidence is summary judgment proper." Id.

   B. REVIEW OF PLAINTIFF'S DISABILITY CLAIM

   The parties have stipulated that the proper standard of
review to be applied to Quigley's claim is de novo review. The
plan provides that, "[w]hen [UNUM] receives proof that an insured
is disabled due to sickness or injury and requires the regular
attendance of a physician, [UNUM] will pay the insured a monthly
benefit after the end of the elimination period." (Dkt. # 30, at
UACL 32). "Disability" and "disabled" are defined in the plan as

-14-

follows:

> because of injury or sickness:
>
> 1.    the insured cannot perform each of the material
>       duties of his regular occupation; and
>
> 2.    after benefits have been paid for 60 months, the
>       insured cannot perform each of the material duties
>       of any gainful occupation for which he is
>       reasonably fitted by training, education, or
>       experience.

(Id., at UACL 30).  The court must now view the contents of
UNUM's claims file and determine whether, for the purpose of
deciding the parties' pending motions, the record lends itself to
but one conclusion regarding Quigley's condition.

In light of the evidence set forth in UNUM's claims file,
Quigley is entitled to judgment as a matter of law.  The record
reveals that Quigley suffers from fibromyalgia, and that she has
been suffering from this condition since September 20, 2000.  The
record also reveals that Quigley experiences chronic, and often
debilitating, pain throughout her body as a direct result of this
condition.  As a secondary consequence of the pain she suffers,
Quigley experiences memory loss and a diminished cognitive
capacity due to lack of sleep and general fatigue associated with
chronic pain.  The treatment she receives for this condition is
aimed at managing the chronic pain through medication and
therapy.  Quigley's complaints of chronic pain, her physicians'
observations of this pain through the tender points test, and her
physicians' prescription of high doses of pain killers are a

sufficient basis for the work limitations mandated by Dr. Singh. Pursuant to these limitations, Quigley is unable to perform her former job and is "disabled" within the meaning of the plan.

UNUM's justification for denying Quigley's application for benefits, which is primarily based upon Dr. Graham's evaluation, cannot be sustained. In her evaluation, Dr. Graham bases her conclusions, in part, on inferences that cannot be supported by the evidence. First, Dr. Graham infers that, because no physician had diagnosed Quigley with fibromyalgia in September of 2000, that Quigley must not have been suffering from fibromyalgia. The record, however, reveals that Quigley complained constantly about her pain during and before September of 2000. The record also reveals that her treating physicians were attempting to rule out other conditions that could cause her the pain Quigley was experiencing. Dr. Graham also infers that, because Dr. Parke never stated that Quigley was disabled, Dr. Parke did not think Quigley was disabled. The record simply does not support any conclusions regarding Dr. Parke's view in this regard.

Second, Dr. Graham bases her conclusion that Dr. Singh's restrictions on Quigley's physical movements are unreasonable on the inference that, because Dr. Singh has restricted movements that are quite common to everyday life, Quigley must be able to perform the proscribed tasks. Dr. Graham's observations

-16-

regarding the severity of the restrictions are, of course, correct, but Dr. Graham does not indicate why Quigley's history of chronic pain does not support them.  The medical records set forth a constant record of chronic pain.  The fact that Dr. Singh has proscribed many common movements does not mean that he is not justified in doing so.

Thus, the court rejects UNUM's justification for rejecting Dr. Singh's restrictions not because UNUM had a duty to give Dr. Singh's opinion special weight, but rather because UNUM does not point to any credible evidence suggesting that Dr. Singh's restrictions were inappropriate.  "[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003); see Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 879 (9th Cir. 2004) ("This paragraph quite plainly holds that a treating physician's opinion gets no special weight and can be rejected on the basis of reliable evidence with no discrete burden of explanation.").  Here, UNUM offers no reliable evidence to rebut Dr. Singh's properly supported opinions.

Dr. Singh's opinions are supported by Quigley's complaints

of pain, which are prominent in the records.  UNUM argues that

Quigley's support for her claim of disability amounts to nothing

more than complaints of pain to her primary care physician, who

then simply accepts the complaints and imposes restrictions

commensurate with these complaints.  UNUM contends that, if an

insurer was required to accept essentially subjective complaints

of pain, with no objective evidence of the etiology of the

disabling symptoms, the insurer would not be fulfilling its duty

to pay only substantiated claims.

        The Court of Appeals for the Second Circuit has stated the

following with respect to the relevance of a claimant's

complaints of pain:

        It has long been the law of this Circuit that "the
        subjective element of pain is an important factor to be
        considered in determining disability."  Mimms v.
        Heckler, 750 F.2d 180, 185 (2d Cir. 1984).  While a
        district court reviewing an administrator's decision de
        novo is not required to accept such complaints as
        credible, . . . it cannot dismiss complaints of pain as
        legally insufficient evidence of disability. . . .

Connors v. Connecticut General Life Ins. Co., 272 F.3d 127, 136

(2d Cir. 2001) (citations omitted).  Where the record reveals

well-documented complaints of chronic pain, and there is no

evidence in the record to contradict the claimant's complaints,

the claim administrator, and the court, cannot discredit the

claimant's subjective complaints.

        Therefore, the court finds that the sole conclusion

permitted by the evidence in the record is that Quigley has met

-18-

the requirements for proving her claim for disability benefits.

### C. ATTORNEYS' FEES

The court finds that an award of attorneys' fees is not warranted. The parties agree that the standard for determining if either party is entitled to an award of attorneys' fees under 29 U.S.C. § 1132(g)(1) is set forth in <u>Chambless v. Masters, Mates & Pilots Pension Plan</u>, 815 F.2d 869 (2d Cir. 1987):

> Ordinarily, the decision is based on five factors: (1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants.

<u>Id.</u> at 871. The record does not indicate that UNUM's skepticism was founded in bad faith. Further, the cases reviewed by the court reveal substantial disagreement regarding the evidence necessary to award disability benefits to a beneficiary suffering from fibromyalgia. Although the court, reviewing her claim <u>de novo</u>, has decided to award Quigley benefits, UNUM's position did have some merit. Given the relative merit of each party's position, the court finds it unlikely that an award of fees would serve as a deterrent to other plan administrators. As such, in consideration of the <u>Chambless</u> factors, an award of fees is not warranted.

### III.  CONCLUSION

For the reasons set forth herein, plaintiff's motion for summary judgment (dkt. # 31) is **GRANTED**, and defendant's motion for summary judgment (dkt. # 31) is **DENIED**.  The Clerk shall enter judgment in favor of the plaintiff as follows:

1.  Defendant UNUM Life Insurance Company of America shall pay benefits to Sharon Quigley, in an amount due under the terms of the plan, plus prejudgment interest at the statutory rate, that have accrued from December 19, 2000 through the present date; and

2.  Defendant UNUM Life Insurance Company of America shall reinstate any benefit or status to Sharon Quigley attendant to her being disabled under the terms of the plan as of September 20, 2000.

So ordered this 12th day of October, 2004.

**/s/DJS**
_____
    **DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**

-20-